## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JULIUS J. CLARK, | ) |
| | ) |
| Petitioner, | ) Civil Action No. 2:12 - 213 |
| | ) District Judge Nora Barry Fischer |
| vs | ) Magistrate Judge Cynthia Reed Eddy |
| | ) |
| JOSEPH F. MAZURKIEWICZ; *ET AL.*, | ) |
| | ) |
| Respondents. | ) |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and

that a certificate of appealability be denied.

## II. REPORT

Petitioner, Julius J. Clark, a state prisoner incarcerated at the State Correctional

Institution at Huntingdon, Pennsylvania has petitioned for a writ of habeas corpus pursuant to 28

U.S.C. § 2254 in connection with his convictions for robbery and related charges. For the

reasons that follow, the Petition should be denied as without merit.

### A. Relevant Factual and Procedural History

On direct appeal, the Superior Court set forth the following relevant factual history.

The Appellant was charged at CC200410202 with Robbery of a Motor
Vehicle, Robbery, Unlawful Restraint, and Possessing Instruments of Crime. As
to these charges, the Commonwealth showed at trial that on September 23, 2003,
at approximately 12:15 pm, Michelle Watson was sitting in her car parked in the
lot of a McDonald's located in the East Liberty Section of Pittsburgh. She was
preparing for class at the seminary school which she attended. It was then that the
Appellant jumped into the car, brandished a knife, and made Ms. Watson drive
around for 10 to 15 minutes. The Appellant, while threatening to stab and kill
her, took Ms. Watson's money, wallet, and a money access card. Before jumping
from the vehicle, the Appellant made his victim write down her personal

1

identification number to the access card. Ms. Watson was later able to identify the Appellant as her assailant via a photo array, and at a subsequent line-up.

The Appellant was charged at CC200410204 with Robbery. The Commonwealth proved that about a half hour after the incident involving Ms. Watson, the Appellant snatched Lynn Pesta's purse as Ms. Pesta and her friend, Tamara Lord, walked around a hospital located near East Liberty during their lunch break. Ms. Pesta was able to pick the Appellant's picture out of a photo array, but identified an individual standing next to the Appellant at a line-up. Ms. Lord identified the Appellant as the purse-snatcher from the photo array, and the line-up.

The Appellant proceeded to a jury trial and was found guilty of all charges on March 27, 2006. Appellant was sentenced on June 21, 2006 to a combined period of incarceration of 10 to 230 years. A Notice of Appeal was filed on July 19, 2006.

ECF No. 12-3, pp. 39-40.

On February 23, 2007, the trial court filed its Opinion affirming Petitioner's judgment of sentence (ECF no. 12-3, pp. 38-41). On February 28, 2008, the Superior Court of Pennsylvania affirmed Petitioner's judgment of sentence (ECF no. 112-4, pp. 19-24). Petitioner filed a Petition for Allowance of Appeal to the Supreme Court of Pennsylvania, which was denied by that Court on September 23, 2008.

On October 29, 2008, Petitioner filed a *pro se* petition for relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa. Cons. Stat. §9541, *et seq.* Thereafter, counsel was appointed and an amended PCRA Petition was filed. On January 19, 2010, the PCRA Court issued a final order dismissing Petitioner's PCRA petition without a hearing. Petitioner filed an appeal and on March 17, 2010, the PCRA Court issued its opinion (ECF No. 13-2, pp. 13-23). On November 8, 2010, the Superior Court issued an unpublished opinion, affirming the dismissal of Petitioner's PCRA petition without a hearing (ECF No. 13-6, pp. 1-25). Petitioner filed a Petition for Allowance of Appeal to the Supreme Court of Pennsylvania, which was denied by that Court on April 19, 2011.

Petitioner filed his Petition for a Writ of Habeas Corpus with this Court on February 22,

2012, wherein he raises the following claims.

1. Trial counsel rendered ineffective assistance for failing to object, or take curative action, in response to the Prosecutor's closing argument, which misstated the evidence and assumed facts not in evidence.

2. Trial Counsel rendered ineffective assistance for failing to seek suppression of the suggestive photographic array and line-up identification of Petitioner.

3. Trial Counsel rendered ineffective assistance by failing to object to a jury panel, which had likely been tainted by one juror's relationship to the victim [Ms. Pesta].

4. Trial Counsel rendered ineffective assistance for failing to expose and impeach false and unreliable testimony given by the lead detective regarding the comparison of Petitioner's fingerprints to those found on the victim's car.

5. Trial Counsel rendered ineffective assistance for failing to investigate potentially exculpatory evidence; the Commonwealth violated its duty, under the due process clause, to furnish defense counsel with information.

6. Trial Counsel rendered ineffective assistance for failing to interview and call two available alibi witnesses at trial.

## B. Standard of Federal habeas Corpus Review

In describing the role of federal habeas corpus proceedings, the Supreme Court of the

United States, in Barefoot v. Estelle, 463 U.S. 880, 887 (1983), noted:

[I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996,

Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996, (AEDPA), which further "modified a federal

habeas court's role in reviewing state prisoner applications in order to prevent federal habeas

'retrials' and to ensure that state-court convictions are given effect to the extent possible under

law." Bell v. Cone, 535 U.S. 685, 693 (2002).

Amended Section 2254 of the federal habeas corpus statute provides the standard of

review for federal court review of state court criminal determinations and provides, in relevant

part, as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to any
claim that was adjudicated on the merits in State court proceedings unless the
adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
State Court proceeding.

28 U.S.C.§ 2254(d).

"Clearly established Federal law" should be determined as of the date of the relevant

state-court decision and is limited to the record that was before the state court that adjudicated

the claim on the merits. Greene v. Fisher, ___ U.S. ___, 132 S.Ct. 38 (2011); Cullen v.

Pinholster, 563 U.S. ——, 131 S.Ct. 1388, 1398 (2011). A state-court decision is "contrary to"

clearly established federal law if the state court (1) contradicts the governing law set forth in

Supreme Court cases or (2) confronts a set of facts that are materially indistinguishable from a

decision of the Supreme Court and nevertheless arrives at a different result. Williams v. Taylor,

529 U.S. 362, 405-06 (2000); Jamison v. Klem, 544 F.3d 266, 274 (3d Cir. 2008). The state

court judgment must contradict clearly established decisions of the Supreme Court, not merely

law articulated by any federal court, Williams, 529 U.S. at 405, although district and appellate

federal court decisions evaluating Supreme Court precedent may amplify such precedent,

4

Hardcastle v. Horn, 368 F.3d 246, 256 n. 3 (3d Cir. 2004) (citing Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999)). The state court is not required to cite or even have an awareness of governing Supreme Court precedent "so long as neither the reasoning nor the result of [its] decision contradicts them." Early v. Packer, 537 U.S. 3, 8, (2002); Jamison, 544 F.3d at 274-75. Few state court decisions will be "contrary to" Supreme Court precedent.

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent. A state-court decision 'involves an unreasonable application" of clearly established federal law if the state court (1) identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case; or (2) unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. Williams, 529 U.S. at 407. A showing of clear error is not sufficient. Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). Nor is habeas relief available merely because the state court applied federal law erroneously or incorrectly. Thomas v. Varner, 428 F.3d 491, 497 (3d Cir. 2005); Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. ——, ——, 131 S.Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Harrington, 131 S. Ct. at 786–87.

5

The Supreme Court repeatedly has reiterated the deference that the federal courts must accord to state court decisions. *See* Felkner v. Jackson, —— U.S. ——, 131 S.Ct. 1305, 1307 (2011) ("AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt."); Harrington v. Richter, ___U.S.___, 131 S.Ct. 770, 786 (2011) ("We must use habeas corpus as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."); Renico v. Lett, ___ U.S. ___, 130 S.Ct. 1855, 1862 (2010) ("whether the trial judge was right or wrong is not the pertinent question under AEDPA"); Schriro v. Landrigan, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); Lockyer v. Andrade, 538 U.S. 63, 75 (2003) ("it is not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was erroneous.").

Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. *Id.* (citing Marshall v. Lonberger, 459 U.S. 422, 433 (1982)).

## C. Petitioner's Claims

All of Petitioner's claims assert ineffective assistance of counsel. In this regard, the Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)). *See also* Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) (holding that the essence of a claim alleging ineffective assistance is whether counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect).

The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: 1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687. The first prong of the Strickland test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 688. The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair and unreliable. Strickland, 466 U.S. at 689. A defendant is not entitled to relief unless he makes both showings. *Id.* at 687. Moreover, "[a] court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." *Id.* at 694. The Strickland standard applies equally to appellate counsel. Smith v. Robbins, 528 U.S. 259, 285 (2002). Pennsylvania applies the same test for ineffective

assistance of counsel as the Strickland test used in federal courts. Werts v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2000).

With regard to the first criterion, counsel's effectiveness is measured objectively considering all the circumstances. Strickland, 466 U.S. at 687-88. In evaluating counsel's performance, the Court must "indulge a strong presumption" that counsel's challenged actions might be considered sound strategy under the circumstances. *Id.*at 689. "Strickland and its progeny make clear that counsel's strategic choices will not be second guessed by *post hoc* determinations that a different trial strategy would have fared better." Rolan v. Vaughn, 445 F.3d 671, 681-82 (3d Cir. 2006) (citing Strickland, 466 U.S. at 689). The relevant inquiry is not whether counsel was prudent, appropriate, or perfect; rather, the focus is simply to ensure that Petitioner received a fundamentally fair trial.

With respect to the second criterion, to establish prejudice, the defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Prejudice must be evaluated in light of the "totality of the evidence presented at trial" and a verdict only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Rolan, 445 F.3d at 982 (quoting United States v. Gray, 878 F.2d 702, 712 (1989)).

In analyzing Petitioner's claims under the two-part test announced in Strickland, this Court must apply the standards set forth in section 2254(e) concerning the presumption of correctness applicable to state court factual findings. The question of effectiveness of counsel under Strickland is a mixed question of law and fact; it requires the application of a legal

8

standard to the historical, fact determinations. Berryman, 100 F.3d 1089, 1095 (3d Cir. 1996).

In this regard, a state court's finding that counsel had a trial strategy is a finding of fact to which

the presumption applies. *Id.* Likewise, a state court's determination that a decision was a

tactical one is a question of fact. *Id.*

The Supreme Court recently reiterated the difficulty of prevailing on an ineffectiveness

claim on habeas review.

> The pivotal question is whether the state court's application of the
> Strickland standard was unreasonable. This is different from asking whether
> defense counsel's performance fell below Strickland's standard. Were that the
> inquiry, the analysis would be no different than if, for example, this Court were
> adjudicating a Strickland claim on direct review of a criminal conviction in a
> United States district court. Under AEDPA, though, it is a necessary premise that
> the two questions are different. For purposes of § 2254(d)(1), "an unreasonable
> application of federal law is different from an incorrect application of federal
> law." A state court must be granted a deference and latitude that are not in
> operation when the case involves review under the Strickland standard itself.

Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011) (internal quotations and citations

omitted). The Court further instructed:

> Surmounting Strickland's high bar is never an easy task. An ineffective-
> assistance claim can function as a way to escape rules of waiver and forfeiture and
> raise issues not presented at trial, and so the Strickland standard must be applied
> with adversary process the right to counsel is meant to serve. Even under de novo
> review, the standard for judging counsel's representation is a most deferential
> one. Unlike a later reviewing court, the attorney observed the relevant
> proceedings, knew of materials outside the record, and interacted with the client,
> with opposing counsel, and with the judge. It is all too tempting to second-guess
> counsel's assistance after conviction or adverse sentence. The question is whether
> an attorney's representation amounted to incompetence under prevailing
> professional norms, not whether it deviated from best practices or most common
> custom.
>
> Establishing that a state court's application of Strickland was unreasonable
> under § 2254(d) is all the more difficult. The standards created by Strickland and
> § 2254(d) are both highly deferential and when the two apply in tandem, review is
> doubly so. The Strickland standard is a general one, so the range of reasonable
> applications is substantial. Federal habeas courts must guard against the danger
> of equating unreasonableness under Strickland with unreasonableness under

§2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington, 131 S.Ct. at 788 (internal quotations and citations omitted). Petitioner's claims will be reviewed under this standard.

1. Prosecutorial Misconduct

Petitioner's first claim is that his trial counsel rendered ineffective assistance by failing to object when the Prosecutor misstated the evidence by theorizing that Petitioner may have attempted to hide his identity during the crimes by wearing a wig and by vouching for the victim's credibility. Allegations of prosecutorial misconduct are reviewed under the standards for fundamental fairness as guaranteed under the Due Process Clause. Darden v. Wainwright, 477 U.S. 168, 181 (1986); Smith v. Phillips, 455 U.S. 209, 219 (1982). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Bagley, 473 U.S. 667, 676 (1985) (quoting United States v. Agurs, 427 U.S. 97, 108 (1976)). The relevant question is whether the prosecutors' comments so infected the trial with unfairness so as to make the resulting conviction a denial of due process. Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). In making this determination, the statements or conduct at issue cannot be viewed in isolation. Rather, a court must assess the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution. United States v. Young, 470 U.S. 1, 11 (1985). In other words, "the court must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly." *Id.* Moreover, a prosecutor's statement regarding the credibility of a witness can constitute grounds for reversal only if the defendant can show that he was prejudiced by those comments.

10

United States v. Swinehart, 617 F.2d 336, 339 (3d Cir. 1980). A determinative factor in this analysis is whether the prosecutor's comments suggested that he or she had knowledge of evidence other than that which was presented to the jury. Buehl v. Vaughn, 166 F.3d 163, 176 (3d Cir. 1999) (citations omitted).

Petitioner raised this claim in his PCRA proceeding where the Superior Court made the following determination.

## II. Failure to Object to the Commonwealth's Closing Argument

Clark argues that trial counsel was ineffective for failing to object twice during the Commonwealth's closing argument because the Commonwealth misstated the evidence presented and vouched for the credibility of one of the victims. The PCRA court found that Clark was not prejudiced by either comment and trial counsel was not ineffective for failing to object during the closing argument. The trial court also notes that it instructed the jury twice that arguments of counsel were not to be considered as evidence, and thus, a new trial is not warranted.

. . .

### A. Reference to Clark Wearing a Wig

Clark first asserts that the prosecutor misstated the evidence and misled the jury when it mentioned that it was possible that Clark was wearing a wig during commission of the robberies, as there was no evidence presented to support that contention. The record reflects that Clark's defense centered on misidentification. During closing argument, the defense argued extensively that Clark does not match the description given by the robbery victims and witnesses, especially based on the fact that the perpetrator was said to have dreadlocks. Trial counsel stated that this was slipshod police work and that there was no reasonable basis to consider Clark as a suspect in these robberies.

In response, the Commonwealth argued in its closing arguments as follows:

> So to that end what would the criminal do to make sure that they would get away with the crime? They would make sure people could not identify them. And how would they do that? Disguise themselves.

11

Well, there's no bandanna. There's no mask. What other way can people hide their appearance? Either change your hairstyle [or] perhaps put on a wig.

What did Ms. Lord tell us about this hair? Now, Ms. Lord was in a unique situation. She thankfully wasn't one of the people getting robbed. So she was an observer. And what did she observe? What did she tell us? There was just something unusual about that hair. They were dreadlocks. They were black with this maroonish red tint which just seemed so unusual that a man would walk around with that kind of hair.

Now, ask yourselves, is it that unusual? Would it be that unusual because it wasn't real hair? Because it was a wig that could easily be discarded when the robbery was done and after he had gotten away. I submit to you, ladies and gentlemen, that the hair in question is just a red herring. It wasn't real hair. It was a wig that was as easily discarded as Ms. Pesta's purse.

Detective Nee testified to the Commonwealth's belief that Clark was the perpetrator and that he wore a wig during the commission of the robberies. Ms. Lord testified regarding her surprise that a man would wear tinted dreadlocks, and that it was something that stood out in her mind. Clark's sister testified that Clark did not wear dreadlocks at any time, including on the date in question. However, the two victims and one eyewitness identified Clark as the assailant in both crimes based upon their recollection of his face. Although there was no direct evidence that Clark was wearing a wig when he committed the crimes, it is a reasonable inference based upon the evidence that was presented. Thus, for the Commonwealth to reiterate in its closing that Clark may have disguised his appearance by wearing a dreadlock wig was not the impermissible "inferential leap" that Clark suggests. Rather, it is a reasonable inference drawn from the testimony provided at trial and in response to the arguments made in the defense closing. Therefore, the PCRA court did not err by finding this issue to be without merit.

## B. Commenting on Watson's Credibility

Second, Clark asserts that the prosecutor unfairly vouched for the victim's testimony while inserting unsubstantiated personal or unsworn scientific opinion into the argument which had no basis in the record.

. . .

The record reflects that in the closing argument for the defense, trial counsel called into question Ms. Watson's description of the perpetrator and subsequent identification of Clark:

You can see in his mug shot, if you look closely, he has scarring around his eyes on his cheek here and here. That [Ms. Watson] says she sat in the car with him and she's on this side and he's right here and she's looking at him several times. She's looking at him in the face, and at points they're talking about school. She never notices anything about any scars.

She says he's in his twenties. He's six foot tall and that it is definitely dreadlocks. It's not a wig.

In the Commonwealth's closing, the prosecutor responded as follows:

With regard to Ms. Watson's identification, she's in the car with this man for a significant period of time. She looks at him. Unfortunately, she didn't get all the wonderful information: the exact height, the exact age, the exact hair color. You don't ask a person that's holding a knife to your side who they are and where they live, how tall they are, how much they weigh, and all that information.

At that moment with that knife at her side, the face of her robber was ingrained in her memory. And the next time that she saw it in the photograph, she identified him, because it was the man that almost put a knife in her body.

Now, when she saw that person in person in that physical line-up, she identified him, because she will always be able to identify him. It's one of those things where she could probably years from now recognize the man.

Human nature has shown that there are certain instances where, especially some traumas or situations in which individuals find themselves that the mental processes are so instilled as if the image of those events are being relieved by the person as they remember them.

A lot of people talk about soldiers in combat. There are men who can tell you exactly how the sand felt on their face as they buried themselves into the sand to avoid an enemy's bullet on any of the islands of the Pacific during the Second World War. Or any of the dirt fields in Europe, or any of the beaches in Europe during that conflict. Or any conflict. Because it was such a traumatic event and the mental processes are so instilled, they will always remember it.

13

And that's the nature of Ms. Watson's memory of this event.

> We find this argument to be responsive to, and commensurate with, the attacks on Ms. Watson's identification of Clark made in the closing for the defense. We disagree that the prosecutor interjected a personal opinion as to Ms. Watson's credibility. Instead, at most, the prosecutor's argument was permissible oratorical flair responsive to the defense contentions' that her identification was not worthy of belief. As this issue is likewise meritless, the PCRA court did not err by failing to hold an evidentiary hearing on this basis.

Sup.Ct.Op. pp. 8-15 (ECF No. 13-6, pp. 8-15) (internal citations omitted).

As noted by the Superior Court, the prosecutor's argument was properly grounded in the trial evidence and was a fair response to the defense's argument. Therefore, Petitioner has not shown the first requirement for his ineffectiveness claim, *i.e.*, that any objection from trial counsel would have been sustained. Failure to make the required showing of deficient performance defeats his ineffectiveness claim and the Court need not determine prejudice. Strickland, 466 U.S. at 700. More importantly, Petitioner has failed to show that the Superior Court's ruling is contrary to, or an unreasonable application of, clearly established federal law. As such, he has failed to show that he is entitled to relief with respect to his first ineffectiveness claim.

### 2. Suppression of Identification

In his second claim, Petitioner asserts trial counsel's ineffectiveness for failing to seek suppression of the photographic array and line-up identifications of Petitioner as the assailant. In Simmons v. United States, 390 U.S. 377 (1968), the Supreme Court set forth a governing principle for judicial review of convictions based on in-court identifications following pretrial identification using photographs. The Court held that, after considering a conviction "on its own facts," courts may set the conviction aside "only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable

misidentification." *Id.* at 384. The Supreme Court has made clear that due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. Neil v. Biggers, 409 U.S. 188 (1972). Moreover, even when the police use such a procedure, suppression is not the inevitable consequence. Manson v. Brathwaite, 432 U.S. 98, 107 (1977). Instead of mandating a *per se* exclusionary rule, the Supreme Court has held that the Due Process Clause requires courts to assess the totality of the circumstances, on a case-by-case basis, and determine whether improper police conduct created a "substantial likelihood of misidentification."

> We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony ... . The factors to be considered . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

Brathwaite, 432 U.S. at 114 (internal citation omitted).

Petitioner raised this claim in his PCRA proceeding where the Superior Court held as follows.

> First, Clark argues that the array was unduly suggestive because the photographs in the array all resembled Clark and not the description of the assailant given by the victims and witness. . . . This Court [has] found that contradictions between the description of the assailant and the identification made are a matter of credibility, not any undue suggestiveness of the photo array. A question of suggestiveness arises when they do not resemble the suspect, and that individual is distinguishable from the other pictures in the array, *not* when the photographs in the array do not resemble the description given by the victim or witness. Thus this argument is without merit.

> Clark further argues that the police neglected to secure counsel for Clark even though they knew he was incarcerated on another case and already represented by counsel. Counsel would have ensured the fairness of the identification proceedings. However, this Court has previously held that the right to counsel at a photographic array does not attach when the suspect is in custody

15

for a different offense than that for which the array has been compiled. Therefore, this argument is also without merit.

Lastly, Clark argues that the identification made in Ms. Pesta's case was tainted by the fact that Ms. Pesta was present when Ms. Lord viewed the photo array and was able to observe and hear a part of the first identification procedure. The record reflects that Detective Nee testified that Ms. Pesta was standing in the doorway of the room when Ms. Lord was presented with the photo array and identified Clark as the perpetrator of Ms. Pesta's robbery. He indicated that he was standing in between Ms. Lord and Ms. Pesta, and that Ms. Pesta could not have seen who Ms. Lord selected, but that she likely heard Ms. Lord indicate that she recognized someone in the array. Ms. Lord identified Clark as the perpetrator, and Ms. Pesta subsequently also identified Clark as the perpetrator.

Our review of the record reveals that Detective Nee further testified that he did not put a lot of stock in Ms. Pesta's identification of Clark. Detective Nee testified that he considered not even having Ms. Pesta look at the photo array, but decided she should because she was the victim of the crime. He stated that Ms. Pesta was not very helpful in providing information to aid in identifying the perpetrator of her robbery. Indeed, Ms. Pesta testified that because she was so afraid at the time of the robbery, she was unable to give any kind of description to the police other than the robber's height and a general description of the jacket he was wearing. The jury was thus aware that Ms. Pesta's identification of Clark as the perpetrator was not very credible in the eyes of the police.

Therefore, regardless of whether Ms. Pesta's identification of Clark in the photo array was tainted by this procedure, the admission of this identification was harmless error, as the prejudice suffered by Clark as a result of this evidence was *de minimus*. Moreover, the erroneously admitted evidence was merely cumulative of other untainted evidence, namely Ms. Lord's identical identification. Thus, this issue is without merit.

Based upon our resolution of Clark's arguments on this issue, Clark's assertion that the photographic array tainted the line-up identifications is likewise without merit. As all of the arguments raised regarding the photographic array are without merit, trial counsel could not have been ineffective for failing to bring a motion to suppress the identifications made based on the array. Therefore the PCRA Court did not err by failing to hold an evidentiary hearing on this issue.

11/08/2010 Sup.Ct.Op. at 22-25 (ECF No. 13-6) (internal citations and footnote omitted).

On habeas review, the state courts' factual findings with respect to the appearance of the

photographs is presumed to be correct unless it is rebutted with clear and convincing evidence.

28 U.S.C. § 2254(e)(1). *See* Alvarez v. Keane, 92 F.Supp.2d 137, 152 (E.D.N.Y. 2000) (holding

16

that while "a state court's finding on the overall constitutionality of challenged identification testimony is not entitled to the presumption of correctness," the "findings of historical fact which underlie the state court's conclusion on this question" are entitled to this presumption); Jones v. Fischer, Civil No. 05-7775, 2009 WL 884814 at \*4 (S.D.N.Y. March 30, 2009) ("[t]he state court's finding that Jones's photograph in the array would not cause him to be unfairly singled out is a finding of fact entitled to deference"). Petitioner has not presented any evidence to rebut the factual determinations made by the State Courts. Nor has he shown that the state courts' determinations are contrary to, or an unreasonable application of, clearly established federal law. *See* United States v. Ash, 413 U.S. 300 (1973) (holding that the Sixth Amendment does not grant the right to counsel at photographic displays conducted by the Government for the purpose of allowing a witness to attempt an identification of the offender). Thus, Petitioner is not entitled to habeas corpus relief as to this claim. *Accord* Cotton v. Armontrout, 784 F.2d 320 (8th Cir. 1986).

3.    Impartial Jury

Petitioner's third claim asserts that Trial Counsel rendered ineffective assistance by failing to object to a jury panel that had been tainted by one juror's relationship to the victim, Ms. Pesta. The Sixth Amendment guarantees that in all criminal prosecutions, the accused shall enjoy the right to trial by an impartial jury. This right, held applicable to the states through the Fourteenth Amendment's Due Process Clause, requires that a defendant be provided a fair trial by a panel of impartial, "indifferent" jurors whose verdict is based solely on the evidence developed at trial. Irvin v. Dowd, 366 U.S. 717, 722 (1961). *See also* Morgan v. Illinois, 504 U.S. 719, 726 (1992).

The process of a jury *voir dire* protects the right to an impartial jury "by exposing possible biases, both known and unknown, on the part of potential jurors." McDonough Power

17

Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984). A party alleging unfairness based on undisclosed juror bias first must demonstrate that a juror failed to answer honestly a material question on *voir dire* and second, that the correct response would have provided a valid basis for a challenge for cause. McDonough Power Equip., 464 U.S. at 556. "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.*

Moreover, qualified jurors need not be totally ignorant of the facts and issues involved.

To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Irvin, 366 U.S. at 723. *See also* Murphy v. Florida, 421 U.S. 794, 799-800 (1975).

The constitutional requirement of impartiality is satisfied if the jury is capable and willing to decide the case solely on the evidence before it. Smith v. Phillips, 455 U.S. 209, 217 (1982). Unless a defendant can demonstrate otherwise, jurors are presumed to be impartial and follow their oaths to deliberate only upon the evidence adduced at trial. Irvin, 366 U.S. at 723. In federal habeas corpus review, the trial judge's determination of a jury's impartiality is a finding of fact subject to special deference absent clear and convincing evidence otherwise. Patton v. Yount, 467 U.S. 1025, 1031, 1038 (1984).

The Trial Court made the following determination with respect to this claim.

Next on the Defendant's buffet of issues is that counsel was ineffective for failing to object to the jury panel. A juror initially selected to serve in this case informed the Court that one of the victims was a niece of the juror's husband. The juror stated that she told no other members of the panel of this relationship. The juror was dismissed, and the trial continued with an alternate being seated.

Why the entire jury panel, as the Defendant would argue, should have been dismissed is beyond this Court's comprehension. There was no basis for

18

dismissing the entire jury. The dismissed juror never told the others of her tie with one of the victims. If counsel had requested the dismissal of the entire jury, the request would have been denied in that it has no basis in the law. Furthermore, it is unclear how this incident denied the Defendant a fair trial. There is no merit in his issue.

Trial Ct.Op. at 8-9 (ECF No. 13-2, pp. 21-22) (internal citations omitted).

In reviewing the merits of the claim, the Superior Court made the following determination.

## V. Failure to Object to Jury Panel

Clark further argues that trial counsel was ineffective for failing to object to the entire jury panel once it was determined that one of the jurors was related to one of the victims. The record reflects that the day after jury selection, prior to trial commencing, juror number 3 indicated that after she left the courthouse the day before, she realized that Ms. Pesta was her husband's niece. She testified that she did not realize it at the time of *voir dire* because Pesta is her married name and the juror and her husband are not close to her husband's family. After checking her address book that night, she determined that there was a relative by the name Lynn Pesta, and the juror believed she may have seen her in the hallway of the courthouse that morning. The juror testified that she did not believe she could be a fair and impartial juror because she does not have a good relationship with her husband's side of the family. The record further reflects that in response to trial counsel's concern, juror number three was asked whether she spoke with any of the other jurors about her relationship with Ms. Pesta, and she indicted that she had not talked to anyone on the jury about this issue. Despite this testimony, Clark asserts that he was deprived a fair *voir dire* based upon the distinct possibility of prejudice.

. . .

Clark presents no support for his argument that the jury was tainted in any way by juror number three's belated discovery of her knowledge of one of the victims in this case. Likewise, there is no support in the record for his assertion that trial counsel was ineffective in any regard in her handling of this matter. As such, we agree with the PCRA Court that this issue is meritless and did not warrant an evidentiary hearing.

Sup.Ct.Op. at 20-22 (ECF No. 3-1, pp. 20-21) (some internal citations omitted).

19

The record in this case does not establish that Petitioner's constitutional right to an impartial jury was denied. Thus, the Pennsylvania Superior Court decision rejecting this assignment of error was neither contrary to nor an unreasonable application of federal law based on the facts presented and Petitioner is not entitled to habeas corpus relief on this claim. *Cf.* Government of Virgin Islands v. Bodle, 427 F.2d 532, 534 (3d Cir. 1970) (in rape prosecution, presence on jury of juror who had had sister who had been victim of forcible rape and murder did not create situation so fundamentally unfair as to constitute denial of due process of law or Sixth Amendment right to impartial jury). As such, he is not entitled to relief as to this claim.

### 4. Failure to Impeach False Testimony

Petitioner next claims that his counsel rendered ineffective assistance for failing to expose and impeach false and unreliable testimony given by the lead detective regarding the comparison of Petitioner's fingerprints to those found on the victim's car. This claim invokes the protections of the Confrontation Clause.

> The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, means more than being allowed to confront the witness physically. Indeed, the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. Of particular relevance here, we have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And, as we observed earlier this Term, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

20

Delaware v. Van Arsdall, 475 U.S. 673, 678-679 (1986) (internal quotations and citations

omitted).

In reviewing the merits of the claim, the Superior Court made the following

determination.

## IV.    Failure to Impeach Detective Nee

Next, Clark asserts that trial counsel was ineffective for failing to
recognize and expose the false and unreliable testimony given by Detective Nee
regarding the alleged comparison of Clark's fingerprints to those found on the
exterior of the victim's vehicle. Clark baldly asserts that, contrary to Detective
Nee's testimony that he submitted Clark's fingerprints for analysis, no
comparison between his prints and the prints found on Ms. Watson's vehicle was
ever made. He bases his belief on the fact that Ms. Watson's vehicle was
processed for fingerprints by Detective Walker on September 23, 2003 and Clark
was not identified as a suspect until January of 2004, which, according to Clark, is
proof that Detective Nee was lying when he testified.

We are truly perplexed by this argument. Initially, we note that Clark
appears to equate the processing of a crime scene for evidence with the analysis
and comparison of a suspect's fingerprints based upon the processing of the
scene, which is not correct. Furthermore, the testimony provided at trial revealed
that Clark's prints did not match those prints found on Ms. Watson's vehicle.
This was very favorable testimony for Clark. Detective Nee testified that
although no report was generated saying that Clark's fingerprints did not match,
he received a sheet from the fingerprints analyst that stated "negative for ID,
which he found to be pretty self-explanatory that Clark's fingerprints didn't match
the two obtained from Ms. Watson's vehicle. There is absolutely no support in
the record for the assertion that Detective Nee's testimony on this issue was in
any way false or misleading, or that he failed to submit Clark's prints for
comparison with the prints found on Ms. Watson's vehicle, as he testified he did.
Therefore, the record does not reflect that trial counsel had any basis to impeach
or expose the detective during cross-examination, and we agree with the PCRA
Court that this issue is without merit.

Sup.Ct.Op. at 19-20 (ECF No. 3-1, pp. 19-20) (internal quotations and citations omitted).

Petitioner has failed to show that this determination is contrary to, or an unreasonable

determination of clearly established Supreme Court law. *Cf.* Nicoloudakis v. Abraham, 296 Fed.

App'x 280, 284 (3d Cir. 2008) (holding that failure to cross-examine victim in an attempt to

discredit him did not prejudice defense under Strickland standard). Consequently, he is not entitled to relief as to this claim.

5.    Failure to Investigate/Failure to Disclose

Next, Petitioner asserts that counsel rendered ineffective assistance for failing to investigate potentially exculpatory evidence and the Commonwealth violated its duty, under the due process clause, to furnish defense counsel with information. This claim has two separate components: a Sixth Amendment claim for failure to investigate and a Due Process claim for failure to provide favorable evidence to the accused.

With respect to the first issue, trial counsel has a duty to make reasonable investigations. Notwithstanding, there are countless ways to provide effective assistance in any given case. Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 779 (2011) ("Rare are the situations in which the latitude counsel enjoys will be limited to any one technique or approach."). There comes a point where a defense attorney will reasonably decide that one strategy is in order, thus making other particular investigations unnecessary. Strickland, 466 U.S. 691. Thus, as a general matter, the decision not to explore certain aspects is questioned only when counsel fails to conduct any pretrial investigation. United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989) (citing cases).

In evaluating the reasonableness of a defense attorney's investigation, the information provided by the defendant is very important.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.

And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Strickland, 466 U.S. at 691. While strategic decisions made by an attorney after a thorough investigation of the relevant legal and factual backgrounds to a case are "virtually unchallengeable," strategic decisions made by him or her after a less thorough investigation are reasonable only to the extent that reasonable professional judgments supported the limits placed on the investigation. *Id.*

With respect to the second issue, in Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Id.* at 87; United States v. Agurs, 427 U.S. 97 (1976) (Brady applies even in absence of request for the evidence by the accused). The precepts of Brady are premised upon the most basic of constitutional guarantees to a person accused of a crime: a right to due process of law and a fair trial. Simply put, in our system of criminal justice, the government is not entitled to send a person to prison while it conceals from him favorable evidence that would tend to reasonably call into question his guilt. Impeachment evidence squarely falls within the category of evidence that must be disclosed because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." Napue v. Illinois, 360 U.S. 264, 269 (1959); Giglio v. United States, 405 U.S. 150, 153-54 (1972); *see also* United States v. Bagley, 473 U.S. 667 (1985).

There are two components to a Brady claim: 1) favorable evidence must have been suppressed by the government, either intentionally or inadvertently; and 2) the suppressed

23

evidence was material. *See* Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Evidence is "material" within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. In other words, favorable evidence is subject to constitutionally mandated disclosure when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995). *Accord* Banks v. Dretke, 540 U.S. 668, 698-699 (2004).

Petitioner exhausted this claim through his PCRA proceeding where the Superior Court made the following determination.

### III. Exculpatory Evidence

#### *A. Trial Counsel's Failure to Investigate*

Clark next asserts that trial counsel was ineffective for failing to investigate three areas of exculpatory evidence: (1) another suspect by the name of "Christopher" who fit the description of the assailant; (2) an unknown white woman who fraudulently used Ms. Pesta's credit cards the day of the robbery; and (3) fingerprints on Ms. Pesta's purse. The PCRA Court found Clark's claims to be meritless, as he presented no information that would lead the PCRA court to believe that there was any additional evidence that could have been found by further investigation.

Our review of Clark's PCRA petition reveals that, other than assertions of his innocence, he presents no indication that further investigation would have yielded any exculpatory evidence. Regarding "Christopher," the record reflects that on cross-examination, Detective Nee testified that there was another "person of interest" named "Christopher" who wore dreadlocks and was known to commit robberies in the area. This person was ruled out as a suspect, however, as Detective Nee learned that Christopher was incarcerated at the time the crimes were committed. Clark asserts that if counsel had obtained more information about Christopher, she undoubtedly would have obtained exculpatory evidence since [Clark] asserts his innocence. Clark does not, however, indicate why there is any reason to believe that Christopher was not incarcerated as Detective Nee testified.

Furthermore, the record reflects that prior to sentencing, trial counsel made a motion for extraordinary relief on the basis of Christopher being another

24

viable suspect that trial counsel only became aware of at the time of trial. This motion was denied by the sentencing court. To the extent that Clark argues that trial counsel should have requested a mistrial based on the Commonwealth's failure to provide information regarding Christopher in discovery prior to trial, our Supreme Court has stated that this is not discoverable information: "We decline the opportunity to interpret Rule 305(B)(1)(a) [now Rule 573(B)(1)(a)] to require disclosure of every fruitless lead followed by investigators of a crime. The mere existence of other suspects is not "evidence favorable to the accused," but is presumably the expectation rather than the exception."

Commonwealth v. Crews, 536 Pa. 508, 531, 640 A.2d 395, 406 (1994).

Regarding the woman who used Ms. Pesta's credit cards on the day of the robbery, the record reflects that her name was not known to the police. In his PCRA Petition, Clark baldly states that if trial counsel undertook an investigation, she undoubtedly would have learned the identity of the person who furnished the woman the credit card and therefore the identity of the true assailant. Clark gives no indication in his PCRA petition, however, as to how this could have been accomplished, citing only to a police report indicating that a white female in her thirties with brown hair attempted to use Ms. Pesta's credit card at the port Authority Service Center. As this Court has previously held: "Failure to conduct a more intensive investigation in the absence of any indication that such investigation would develop more than was already known is simply not ineffectiveness." Commonwealth v. Wallace, 495 Pa. 295, 298, 433 A.2d 856, 858 (1981); see also Commonwealth v. Poindexter, 646 A.2d 1211, 1217 (Pa. Super. 1994).

Lastly, regarding fingerprints on Ms. Pesta's purse, although Clark asserts that unknown fingerprints were found on the purse, there is no support for that assertion in the record. The record reflects that Detective Nee testified that he never received a report regarding fingerprint analysis being performed on Ms. Pesta's purse. Detective Janice Walker of the Mobile Crime Unit testified about fingerprint lifts performed on Ms. Watson's vehicle. She gave no indication that fingerprint analysis was attempted on Ms. Pesta's purse. To the contrary, she testified that certain surfaces would not allow for fingerprints to be lifted and examined, specifically using a purse as an example of something they would not be able to test for fingerprints. Again, there is no indication that further investigation would have provided any additional information, and thus trial counsel cannot be deemed ineffective on this basis.

Therefore, the PCRA Court did not err in finding this issue was without merit.

*B.     PCRA Court's Denial of Request for Discovery and an Investigator*

25

Clark further argues that the PCRA court erred by denying his request for discovery and an investigator to assist him in obtaining more information about the above-listed evidence. We review denials of post-conviction discovery requests for abuse of discretion. Commonwealth v. Collins, 598 Pa. 397, 455, 957 A.2d 237, 272 (208).

Discovery is prohibited at the PCRA stage absent "a showing of exceptional circumstances." Pa.R.Crim.P. 902(E)(1). The record reflects that in his PCRA petition, at the conclusion of his argument regarding trial counsel's ineffectiveness for failing to investigate the aforementioned evidence, Clark stated that exceptional circumstances exist which warrant discovery under Rule 902(e). The PCRA Court denied this request, likening it to a "fishing expedition." Based on our resolution of the issues, *supra*, we agree that Clark failed to show that exceptional circumstances warranting the grant of discovery or an investigator existed. Therefore the PCRA Court did not abuse its discretion by denying this request.

Sup.Ct.Op. pp. 15-19 (ECF No. 13-6, pp. 15-18 (internal citations and quotations omitted).

Petitioner has the burden of setting forth sufficient facts to support each claim. Moreover, Rule 2(c) of the Rules Governing Habeas Corpus Cases, 28 U.S.C. § 2254, expressly provides, in part, that the petitioner "shall set forth in summary form the facts supporting each of the grounds" specified in the petition. The Court of Appeals for the Third Circuit specifically has held that "[a habeas petitioner] cannot meet his burden to show that counsel made errors so serious that his representation fell below an objective standard of reasonableness based on vague and conclusory allegations that some unspecified and speculative testimony might have established his defense. Rather, he must set forth facts to support his contention." Zettlemoyer v. Fulcomer, 923 F.2d 284, 298 (3d Cir. 1991) (citing Mayberry v. Petsock, 821 F.2d 179, 187 (3d Cir. 1987) (petitioner's vague and general allegations and supporting materials fail to make sufficient showing to justify relief). *See also* Palmer v. Hendricks, 592 F.3d 386 (3d Cir. 2010); Matura v. United States, 875 F. Supp. 235, 237 (S.D.N.Y. 1995) (holding that

Petitioner's bald assertion that counsel should have conducted more thorough pretrial investigation failed to overcome the presumption that counsel acted reasonably).

Petitioner must identify the specific acts or omissions of counsel that form the basis for his claim of ineffective assistance. Specifically, he has not shown any information that would have been obtained, assuming its availability and admissibility, would have produced a different result. Petitioner must provide evidence, not mere conclusory allegations, that counsel would have found exculpatory information. *Cf.* Aldrich v. Wainwright, 777 F.2d 630, 637 (11th Cir. 1985) (speculation insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation). In the present case, Petitioner's bald assertions are inadequate to overcome the presumption that counsel acted reasonably. In addition, Petitioner has not shown that the state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based upon an unreasonable determination of the facts in light of the evidence presented. Thus, he is not entitled to relief as to this claim.

6. Alibi Witnesses

Petitioner's final claim is that his counsel rendered ineffective assistance for failing to interview and call two available alibi witnesses at trial. Trial counsel had a duty to make a reasonable investigation into potential defenses.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

27

Strickland, 466 U.S. at 690-691.

In its review of this claim, the Superior Court held as follows.

## I.   Failure to Subpoena or Interview Witnesses

As his first issue on appeal, Clark asserts that trial counsel was ineffective for failing to call two alibi witnesses - Karen Marshall and Georgina Tyler – to testify in his defense. In order to prevail on a claim of ineffectiveness for counsel's failure to call a witness, the burden of proof is on the defendant to show that: (1) the witness exists; (2) the witness was available to testify at trial; (3) the witness was willing to testify on the defendant's behalf; (4) trial counsel knew or should have known of the witness' existence; and (5) the absence of the testimony prejudiced the defendant. The PCRA Court found that Clark failed to properly plead that trial counsel knew that the witnesses existed or that he was prejudiced by the absence of their testimony.

The record reflects that in connection with his PCRA petition, Clark filed two affidavits signed by Ms. Marshall and Ms. Tyler. In these affidavits, Ms. Marshal and Ms. Tyler indicated: (1) they were available and willing to testify; (2) Clark's attorney never interviewed or contacted them in any manner regarding their testimony; and (3) they would have testified that on the date the crimes were committed, they were with Clark at the home of their sister, Leslie Brown, preparing for a birthday party that Ms. Brown was throwing for Ms. Marshal. Both indicated that Clark was inside the house cleaning and preparing for the party at the time the crimes were committed.

Although Clark effectively pled that the witnesses existed and were willing and available to testify on Clark's behalf at trial, he failed to show that trial counsel knew or should have known about the existence of these witnesses. Indeed, Clark indicated that, if called to testify, trial counsel would state that she could not recall the specifics of the alibi defense in this case but believed that she would have identified all alibi witnesses brought to her attention by Clark in her notice of alibi. Moreover, in his PCRA petition, Clark does not indicate that he ever informed trial counsel of the existence of these witnesses. To the contrary, he states: "trial counsel never *asked* about any further witnesses."

Furthermore, the record does not support Clark's contention that trial counsel should have been aware of the witnesses' existence since counsel presented the testimony of some of those who had attended the party at trial and therefore was aware that others had attended the party. The record reflects that trial counsel called Ms. Brown as an alibi witness in Clark's defense, and that she testified that Clark was at her house cleaning and preparing for Ms. Marshall's party at the time the crimes were committed. Ms. Brown indicated that the *only* people at her home at the relevant times that day were Ms. Brown, Clark, and Ms. Brown's twelve-year-old twin daughters. To the contrary, Ms. Brown was

28

specifically asked if Ms. Marshal was present at her house to help prepare for the party, and Ms. Brown indicted she was not.

This testimony not only contradicts Clark's claim that trial counsel knew or should have known of the existence of other alibi witnesses, but conflicts with the affidavits of proffered testimony that Ms. Marshall and Ms. Tyler would have provided, which may have weakened, not strengthened, his alibi defense. As a result, Clark has not demonstrated that he was prejudiced by the failure to call Ms. Marshall and Ms. Tyler as witnesses at trial.

Sup.Ct.Op. at pp. 5-8 (ECF No. 13-6, pp. 5-8) (internal citations omitted) (emphasis in original).

In order to get relief in this Court, Petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification [under Supreme Court precedent] that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 131 S.Ct. at 786–87. Petitioner has failed to make any such showing in this Court. *Accord* Hess v. Mazurkiewicz, 135 F.3d 905, 909 (3d Cir. 1998) (holding that defendant suffered no prejudice from counsel's failure to call additional alibi witnesses because counsel had "presented a plausible, if ultimately unsuccessful, alibi defense" through other witnesses).

## D. Certificate of Appealability

Section 2253 generally governs appeals from district court orders regarding habeas petitions. Section 2253(c)(1)(A) provides that an appeal may not be taken from a final order in a habeas proceeding in which the detention arises out of process issued by a State court unless a certificate of appealability has been issued. A certificate of appealability should be issued only when a petitioner has made a substantial showing of a denial of a constitutional right. 28 U.S.C. ' 2254(c)(2). Here, the record fails to show a violation of Petitioner's constitutional rights. Accordingly, a certificate of appealability should be denied.

29

## III.  CONCLUSION

Based on the discussion above, it is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

In accordance with the applicable provisions of the Magistrate Judges Act [28 U.S.C. ' 636(b)(1)(B) & (C)] and the Local Rules of Court, the parties shall have fourteen days from the date of the service of this Report and Recommendation to file written objections thereto. Any party opposing such objections shall have fourteen days from the date on which the objections are served to file its response. A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

Cynthia Reed Eddy
January 3, 2013                                              United States Magistrate Judge

Julius J. Clark
GD-2458
SCI Greensburg
165 SCI Lane
Greensburg, PA 15601-9103